UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No: 14-04-GFVT |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| DONALD ROY GRAY, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

While FBI agents were searching his home, Defendant Donald Gray told them of his involvement in child pornography activities.  Gray now seeks to have those statements suppressed because the agents elicited them without notifying him of his Fifth Amendment rights under *Miranda v. Arizona*.  The Court referred this matter to Magistrate Judge Robert Wier, who recommends denying Gray's motion to suppress. [R. 21].  Judge Wier finds that, though these agents did not Mirandize Gray, they were not required to do so because Gray was not "in custody" at time he made the relevant statements.  Gray objects to this conclusion citing the police control of his residence, the number of armed agents at his home, his isolation from his family during the questioning, as well as the accusatory nature of the interview.  [R. 24].  These objections trigger this Court's obligation to conduct a *de novo* review.  *See* 28 U.S.C. § 636(b)(1)(c).  The Court has satisfied that duty, reviewing the entire record, including the parties' arguments, relevant case law and statutory authority, as well as applicable procedural rules.  For the

reasons set forth below, the Defendants' objections to the Magistrate Judge's Recommended Disposition shall be **OVERRULED** [R. 24], and his motion to suppress shall be **DENIED**. [R. 12].

I

The Magistrate Judge conducted an evidentiary hearing on the issues of the Defendants' motion and sets out the factual and procedural background of the case in his Recommended Disposition. [R. 21]. The Court shall not attempt to fully detail what has already been thoroughly described and incorporates his discussion of the record into this Order.[1] However, to briefly summarize, in December 2011, the FBI located information arousing suspicion that Donald Gray was involved with a website containing child pornography. [R. 14-1]. After securing a search warrant, approximately eight law enforcement officials arrived at Gray's residence for the purposes of conducting a search of his home. [R. 21 at 5]. This number included six FBI agents, an FBI task force officer, and Chief Willhoite of the Carrolton Police Department. [*Id*.] Although all of these officers were armed and their weapons were drawn upon entry, they did not point them at any individuals and holstered them for the remainder of the search. [*Id*. at 11].

Without forcing entrance or physically restraining Gray, the officers required him to exit his residence while they conducted the search. [*Id*. at 12]. While Gray was outside his home with Chief Willhoite and Agent Schafer, FBI Special Agent Hoover approached him and asked to speak with him about his internet activities. [*Id*. at 2].

---

[1] Though Gray's factual recitation differs somewhat from the findings of the Magistrate Judge, he does not offer a particularized challenge to the Magistrate Judge's factual findings beyond the context of the enumerated objections. As such, the Court need not sift through and weigh again every fact found by the Magistrate Judge. Had Gray sought such a review, a specific objection would have been required. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). It bears noting, however, that in reviewing the record and applying the required deference to the Magistrate Judge's factual findings, the Court cannot, in any instance, conclude that they are clearly erroneous, which would be a necessary finding were the Court inclined not to uphold them. *See United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007).

Gray agreed to speak with him, but was concerned that the conversation might be overheard by members of his family who were also outside. [*Id*. at 3, 5, 12]. In response to Gray's concern, Agents Hoover and Schafer accompanied Gray to the living room of his home in order to provide more privacy for the discussion. [*Id*. at 12]. Though they did not read Gray his *Miranda* rights, the agents did assure Gray that he was under no obligation to answer the questions and was free to leave. [*Id*. at 5, 13]. Gray again indicated that he was willing to speak with the agents. [*Id*. at 12]. The agents informed Gray of the evidence they had discovered linking him to child pornography activities, but did not threaten him with arrest or criminal charges. [*Id*.] Gray subsequently admitted involvement in certain child pornography activities and provided the officers with information about these activities. [*Id*. at 3].

The interview lasted one and a half to two hours and concluded when Gray agreed to take a polygraph test at the police station. [*Id*. at 13]. Only at the conclusion of the interview did Gray ask to get up so that he could use the restroom, get his shoes, and smoke a cigarette. [*Id*. at 4]. The police officers allowed him to go to the restroom, but escorted him there because the search had not ended. [*Id*. at 12]. Though he was not arrested or required to travel to the station by police car, Gray rode with Chief Willhoite because he did not have alternative transportation. [*Id*. at 6-7]. Chief Willhoite did not engage in further discussion with Gray while he was being transported. [*Id*.] Upon arrival to the police station, Gray remained alone in the waiting room while the agents made ready the polygraph examination. [*Id*. at 6]. Before commencing the examination, Agent Schafer read the *Miranda* warnings to Gray, allowed him to review the warnings on a form, and electronically attached his signature as an indication that he understood

them.  [*Id.*]  Agent Schafer conducted the examination, and informed Gray that the

polygraph had designated some of his responses as deceptive.  [*Id.*]  Gray then become

agitated, said he did not wish to speak any longer, and left the room.  [*Id.*]  Law

enforcement officials subsequently arranged for Gray to be returned home.  [*Id.*]

The parties disagree as to whether Gray was "in custody" under these

circumstances such that it was necessary for the law enforcement officials to read him his

*Miranda* rights.  Gray believes that this interaction constituted a custodial interrogation

and that the agents' failure to advise him of his rights under *Miranda* means that his

inculpatory statements must be suppressed.  The Magistrate Judge agrees with the United

States that Gray was not "in custody" for *Miranda* purposes, and, therefore, the agents

did not offend the Constitution in questioning Gray without first notifying him of his

*Miranda* rights.

## II

The Fifth Amendment to the United States Constitution provides that "[n]o

person…shall be compelled in any criminal case to be a witness against himself."  U.S.

Const. Amend. V.  This right is guarded by the prophylactic rule of *Miranda v. Arizona*,

which requires law-enforcement officers to give warnings, including the right to remain

silent, before conducting a custodial interrogation. 384 U.S. 436, 444 (1966); *Stansbury

v. California,* 511 U.S. 318, 322 (1994). However, "police officers are not required to

administer *Miranda* warnings to everyone….they question."  *Oregon v. Mathiason,* 429

U.S. 492, 495 (1977).  The warnings are required only "when there has been such a

restriction on a person's freedom as to render him 'in custody.'" *United States v.

Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *Oregon,* 429 U.S. at 495 (1977)).  In

determining whether an interrogation occurred while a defendant was "in custody,"

courts are to consider the totality of the circumstances surrounding the encounter "with

the ultimate inquiry turning on whether a formal arrest occurred or whether there was a

restraint on freedom of movement of the degree associated with a formal arrest." *United

States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Stansbury,* 511 U.S. at 322).

(internal quotation marks omitted).  This inquiry is objective, focusing on how "a

reasonable person in the suspect's position would perceive his or her freedom to leave,"

rather than the suspect's actual mindset. *J.D.B. v. N. Carolina,* 131 S.Ct. 2394, 2402

(2011) (internal citations and quotation marks omitted); *Yarborough,* 541 U.S. at 667.  In

making this determination, this Court is guided by the following factors articulated by the

Sixth Circuit:

> (1) the location of the interview; (2) the length and manner of the
> questioning; (3) whether there was any restraint on the individual's
> freedom of movement; and (4) whether the individual was told that he or
> she did not need to answer the questions.

*Hinojosa*, 606 F.3d at 883 (citing *Panak,* 552 F.3d at 465, *United States v. Swanson,* 341

F.3d 524, 529 (6th Cir. 2003), *United States v. Salvo,* 133 F.3d 943, 950 (6th Cir. 1998)).

## A

Judge Wier concludes that the location of the interview militates against a finding

that Gray was "in custody" because the questioning took place in the living room of

Gray's home.  Gray objects to this application of the first factor because, in his view, the

number of officers and their actions transformed his own home into a police-dominated

environment similar to an arrest.

"[A]n important factor underlying *Miranda* was the interrogator's goal of isolating

the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the

individual to the will of his examiner.'" *Panak*, 552 F.3d 462, 466 (6th Cir. 2009) (quoting *Beckwith v. United States,* 425 U.S. 341, 346 & n. 7 (1976)). Because these concerns do not usually apply to interrogations at the suspect's home, "such a venue generally does not present a coercive environment." *Hinojosa*, 606 F.3d 875, 883-84 (6th Cir. 2010) (citing *Panak,* 552 F.3d at 467; *Salvo,* 133 F.3d at 950). Indeed, in *Miranda*, the Supreme Court referenced a police manual which encouraged officers to question a suspect at the police station rather than his home, because "[i]n his own home he may be confident, indignant, or recalcitrant….more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior…." *Panak*, 552 F.3d at 466 (citing *Miranda,* 384 U.S. at 449–50) (internal quotation marks omitted)). The court also noted that, unlike the isolation of a police station, at a suspect's home, "his family and other friends are nearby, their presence lending moral support." *Id*.

Despite the familiarity of a suspect's home, however, an interrogation occurring there can still become custodial under certain situations. *Id. (citing Orozco v. Texas,* 394 U.S. 324, 325–26 (1969)). "The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." *Id*. (citing *United States v. Craighead,* 539 F.3d 1073, 1083 (9th Cir. 2008)).

Gray concedes that the questioning took place in the living room of his home and that interrogations occurring in that location "often will not rise to the kind of custodial situation that necessitates *Miranda* warnings." [R. 24]. However, he argues that the

Magistrate Judge failed to give enough consideration to the fact that a large number of armed police officers controlled Gray's home in such a way that a reasonable person in Gray's position would have felt restrained and unable to terminate the interview.

To Gray's point, rare is the individual whose nerves would remain completely unaffected by the presence of eight agents with guns drawn at his or her front door. Undoubtedly, this number of readily armed law enforcement officers, over whom the suspect had no real legal authority to expel, could have transformed Gray's home into a coercive environment where he did not feel free to leave and felt compelled to talk to the officers. However, when considering the totality of the circumstances of how the interview actually occurred, it becomes clear that the officers did not so employ their numbers, authority, or weapons so as to cause a reasonable person in Gray's position to feel that way.

Gray was not trapped in his home by a swarm of gun-toting policemen. On the contrary, Gray was outside during the search and Agents Hoover and Schafer accompanied him back into his home so that he would have privacy from his family to discuss sensitive issues. The Magistrate Judge finds credible the testimony of Agent Schafer that the interview was relocated into the living room as a result of Gray's concerns that his family would overhear the conversation. Gray takes issue with characterizing this as a "request" from Gray, but the practical effect is the same. That the officers moved locations in response to Gray's concerns, whether or not he requested to go to the living room of his house, demonstrates that Gray maintained a measure of control over the situation. Additionally, with credible evidence in the record that Gray sought some distance from his family, his current argument that forced isolation by the

agents placed him "in custody," rings hollow. It is relevant to this analysis that the officers separated Gray from others out of deference to him rather than out of a desire for isolation or coercion. *See Salvo*, 133 F.3d at 951 ("In this sense, it seems the Agent chose the car out of solicitude for Salvo and to save him from a more public exposure of his criminal activity, not out of a desire to coerce or intimidate him.").

Additionally, though eight officers were present on the scene, only two actually participated in the questioning of Gray. Neither of these two officers, nor any others present at the home, had their weapons drawn during the interview or any time after the initial entry. Gray claims that Judge Wier ought to have placed more significance on the fact that these weapons were present at all, but "this court focuses on whether weapons were drawn rather than merely visible….and [] even a drawn weapon does not necessarily establish custody." *United States v. Conder*, 529 F. App'x 618, 623 (6th Cir. 2013) (citing *Hinojosa,* 606 F.3d at 883; *Swanson,* 341 F.3d at 526, 530–31 (6th Cir.2003)). In *Swanson*, the subsequent questioning of the defendant was not considered custodial even though the officers initially approached the defendant with their guns drawn. Similarly, the customary practice of officers drawing their weapons in advance of a search of Gray's home, does not automatically convert the later questioning to a custodial situation.

Assuredly, the mere fact that eight officers could be summoned to the living room and all of those officers could draw their guns could still affect the perception of reasonable people in Gray's position. However, Agents Hoover and Schafer expressly addressed any of these residual concerns by reassuring Gray that he did not have to speak with them and was free to leave at any time. Gray argues that these were empty words

and no reasonable person in his position would have actually felt empowered to terminate the interview; but this argument is considerably less persuasive in light of the fact that the agents' actions supported the credibility of their words. On two occasions the agents asked Gray's permission to speak with him. As discussed, the officers relocated the interview to a place where Gray would feel more comfortable discussing the sensitive issues at hand. When the interview was over, the officers did not arrest Gray but allowed him to get up and go to the bathroom. Finally, though the officers were still involved in the search of his house, it is not as though Gray did not have a place where he could go to escape the agents or to receive moral support. Had he sought refuge from Agent Hoover or Schafer he simply could have returned to his family outside the house – the place where he was before his concerns contributed to the decision to conduct the interview inside the home. Despite the number of officers and presence of weapons, the location of the Gray's interview was less like a police station and more like home, which is generally not considered to be a venue of custodial interrogation.

## B

The second factor directs courts to consider the length and manner of questioning. Gray argues that the agents' discussion of the evidence against him in advance of questioning implied that charges would be filed against him.[2] Therefore, Gray objects to the conclusion of the Magistrate Judge because he believes this factor should weigh in his favor.

---

[2] Though Gray's objection did not appear to discuss in detail the length of the interview, the Court agrees with Judge Wier that, though the one and a half to two-hour interview was lengthy, it was within a reasonable scope of interviews that have nonetheless been found to be non-custodial. [R. 21] (citing *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)); *see also*, *Conder*, 529 F. App'x at 623 (one hour and forty-five minutes).

Agent Hoover admits that he began the interview with Gray by summarizing the evidence that the officers possessed that connected him to child pornography activities. [R. 21 at 3]. Gray believes that this information was enough to imply that charges were going to be brought against him, converting the interview into a custodial interrogation. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Salvo*, 133 F.3d at 952 (citing *Stansbury*, 511 U.S. at 325)). However, Gray overstates the impact of Agent Hoover's statement because:

> [t]hose beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breath of his or her 'freedom of action.' Even a clear statement from the officer that the person under interrogation is the prime suspect is not in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.

*Id*. (citing *Stansbury*, 511 U.S. at 325)). In *Salvo*, the interrogation did not become custodial even though the agents told the defendant they knew about some of his illegal conduct and the United States Attorney would be prosecuting the case. *Id*. at 952-53. This was in large part due to the fact that the interrogating officers made clear to the defendant from the beginning of the interview that he was not under arrest and was free to leave. *Id*. In this case, Agent Schafer provided the same assurances to Gray. Further, in discussing the evidence they had against Gray, the agents did not go as far as the officers in *Salvo* in that they never expressly threatened Gray with prosecution or any criminal penalties. Therefore, counter to Gray's assertions to the contrary, this factor does not weigh in favor of finding that the interview was custodial.

The final two factors require less analysis because they strongly suggest that Gray was not "in custody" at the time the agents questioned him. Gray argues that the Magistrate Judge focuses too rigidly on the fact that he was not physically restrained because the circumstances previously discussed – the number of armed officers, nature of the interview, and isolation of the defendant – resulted in a "practical restraint" on his freedom of movement. This argument is not only an unfair characterization of Judge Wier's analysis, but is also unfounded on the facts of the record.

According to the testimony of the agents, uncontroverted by evidence from the defendant, they twice asked Gray's permission to speak with him and only proceeded with the questioning after he agreed. Further, Agent Schafer indicates that the agents advised Gray that he did not have to answer their questions and was free to leave. The practical importance of this warning is difficult to overstate. The Sixth Circuit has noted that informing the suspect that he need not answer the question and is empowered to leave "is a particularly important factor in showing no custody occurred." *Panak*, 552 F.3d at 467-68 (6th Cir. 2009) (citing *United States v. Ollie,* 442 F.3d 1135, 1138 (8th Cir. 2006)); *see also Mathiason,* 429 U.S. at 495; *Swanson,* 341 F.3d at 530. Indeed, the court has approvingly cited a 2004 case from the Eighth Circuit which purported to have conducted a survey of cases and found that, with one exception, there was not a single case from the Supreme Court or the courts of appeal that "holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *Id.* (citing *United States v. Czichray,* 378 F.3d 822, 826 (8th Cir. 2004)). Therefore, the assurances given to Gray before the questioning that he could refuse to answer and was

free to leave at a time of his choosing heavily weighs in favor of a finding that Gray was not "in custody" when he made the inculpatory statements at issue.

Gray maintains that even though these warnings had been given to him, a reasonable person in his position would not have felt as though he or she could have, as a practical matter, actually refused to respond to the agents' questions or leave the living room. However, as previously discussed, this representation is unfounded. The conduct of the agents would clearly suggest to a reasonable person that he was, in fact, free to terminate the interview and leave the scene.[3] To reiterate, the officers never physically restrained Gray and twice asked him for permission to speak with him. They did not begin the questioning until he consented. Whether by his request or out of deference to his desire for privacy, the agents relocated the interview to accommodate Gray's concerns. This would reveal to a reasonable person that he or she maintained some control over the encounter. There is no evidence that the officers threatened Gray or demonstrated force to coerce him into speaking with them. Finally, when the interview ended, Gray was not actually arrested. In fact, when he asked for shoes they were provided to him and when he requested to go to the bathroom he was permitted to go. That he was guided there by an officer is immaterial for several reasons. First, the officer did, in fact, take Gray to the place that he wanted to go when he wanted to go there. Second, an escort was justified by a need to preserve the scene and maintain the safety of

---

[3] In the view of this Court, this is a significant difference between this case and the Ninth Circuit case so heavily relied on by Gray, *United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008). *Craighead*, has similar facts and the officers gave similar assurances that the defendant could leave and need not answer the questions asked, but the surrounding circumstances made those representations seem incredible. For example, the officers took the defendant into a secluded storage room, shut the door, and then one of the officers was constantly posted in front of it to give the impression to a reasonable person that he or she would have to go through that officer in order to escape the questioning.

the officers. Finally, even if Gray felt some restriction by the accompanying officer, the interview had already concluded by the time he was walking to the bathroom.

As for the polygraph examination, Gray agreed to travel to the police station to take it and used the police car only because he needed transportation. There was no discussion during that trip. Once he arrived at the police station he was permitted to sit unsupervised in the waiting area and he was notified of his *Miranda* rights before proceeding to the polygraph examination. Although, if Gray's argument that he was practically unable act on the officers' assurances that he did not have to answer the questions and was free to leave is to be accepted, it seems to this Court that the *Miranda* warnings themselves would have not provided him any practical benefit either. Nonetheless, when he became uncomfortable with the interview, Gray ended it and law enforcement provided him a ride home. Under these circumstances a reasonable person would have perceived that he retained freedom of movement during the encounter and was free to refuse to answer the questions asked of him. Therefore, these factors weigh heavily against a finding that Gray was "in custody" during this encounter.

III

Weighing the above referenced factors, the Court agrees with the findings of the Magistrate Judge that Gray was not "in custody" when questioned by law enforcement officers in his home on May 31, 2013. The interview took place in Gray's home and in a room that Gray either consented to or requested. The evidence of the record suggests that solitude was provided, not out of an attempt at coercive isolation, but in deference to Gray's privacy while these sensitive issues were being discussed. Eight agents arrived at his home with guns drawn, but only two conducted the interview, and no agent

unholstered a weapon after entry or during the interview. The interview only started after Gray had twice agreed to speak with the agents. Further, the agents informed him that he had no obligation to answer their questions and was free to leave at any time. The actions of the officers – including the lack physical restraint during the interview or an arrest following the interview – supported this assurance.

As stated in a similar case from the District of Minnesota, "[s]trong evidence of restraint of freedom of movement is required to overcome the natural inference that questioning is non-custodial when the defendant is questioned in the familiar surroundings of his own home, is advised that he is free to leave, and is not arrested at the conclusion of the interview or the search." *United States v. Durand*, CRIM. 11-228 MJD/JJK, 2011 WL 5444112 at *6 (D. Minn. Oct. 24, 2011) (citing *United States v. Czichray*, 378 F.3d 822, 830 (8th Cir. 2004); *United States v. LeBrun,* 363 F.3d 715, 722 (8th Cir. 2004)). It is true that there were a high number of law enforcement officials, the agents had their guns drawn on arrival, and the officers referenced inculpatory evidence against Gray during the interview. However these circumstances – all of which are relevant to the custodial calculus and were thoroughly considered by the Magistrate Judge – are insufficient to overcome other previously discussed factors suggesting that a reasonable person in Gray's position would not have perceived his freedom was restricted in a manner functionally similar to a formal arrest.

Therefore, as Gray was not "in custody," no *Miranda* warnings were necessary and his statements need not be suppressed. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.   The Defendant's Objections to the Magistrate's Report and Recommendation

[R. 24] are **OVERRULED**;

2.      The Magistrate Judge's Recommended Disposition [R. 21] is **ADOPTED** as and for the opinion of this Court; and

3.      The Defendant's Motion to Suppress [R. 14] is **DENIED**.

4.      In light of the changed circumstances resulting from this Order, the Motion of the Defendant to Continue Jury Trial [R. 25] is **GRANTED**;

5.      The Jury Trial of Defendant Donald Roy Gray currently set for Tuesday, July, 1 2014, is continued until **Tuesday, July 29, 2014**, at the hour of **10:00 a.m.** in **Frankfort**.

6.      The pretrial deadlines set forth in the Court's Standing Pretrial and Trial Management Order shall be relative to this new trial date;

7.      In the event a plea agreement is reached in this matter, any motion for rearraignment shall be filed **no later than (14) days** prior to the trial date.  Further, if the parties execute a written plea agreement, the United States of America is directed to provide a courtesy copy to the undersigned's Chambers at *GFVT_chambers@kyed.uscourts.gov* **no later than two (2) days** before the scheduled rearraignment;

8.      The time between June 13, 2014, and July 29, 2014, is **DECLARED** excludable pursuant to 18 U.S.C. §§ 3161(7)(A)-(B).  For the reasons set forth herein, the Court **FINDS** that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendants in a speedy trial.

This the 24th day of July, 2014.



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**